**Crimmins v. PennDOT**

C.P. of Adams County, no. 96-S-1080.

*Shawn P. McLaughlin,* for plaintiffs.
*Jay M. Stack,* for defendant.

GEORGE, *J.,* February 13, 2003—This matter comes before the court on the plaintiffs' motion to compel discovery. During depositions of representatives from the defendant, Pennsylvania Department of Transportation (PennDOT), the plaintiffs[1] attempted to inquire into a number of correspondences forwarded to or offered by PennDOT agents. PennDOT has objected to this inquiry on the claim that the correspondence is protected from discovery by the provisions of 75 Pa.C.S. §3754 (West 1996). A brief summary of the factual background of this matter will aid in disposition of this issue.

1. The pleadings identify the plaintiffs as Jo Robey Crimmins and William F. Crimmins as co-administrators of the estate of Melissa L. Crimmins, deceased, and Kenneth E. Taylor Jr., and Bonnie Taylor, individually and as co-administrators of the estate of Kenneth M. Taylor, deceased, and Danielle Crimmins, a minor by Jo Robey Crimmins, her guardian.

The plaintiffs' complaint alleges that on September 2, 1995, Jo Robey Crimmins was driving her 1984 Buick LeSabre on Cashtown Road, Adams County, after leaving the South Mountain Fair.[2] Melissa Crimmins, Kenneth Taylor, Danielle Crimmins and Jamie Herbst were passengers in her vehicle at the time. At the intersection of Cashtown Road and State Route 30, the Crimmins' vehicle was involved in a tragic accident as the vehicle attempted to enter State Route 30 from Cashtown Road. The force and magnitude of the collision caused the vehicle to burst into flames killing Melissa Crimmins and Kenneth Taylor and causing, according to plaintiffs' complaint, severe physical injuries to the remaining occupants of the vehicle. The plaintiffs' complaint alleges that Route 30 is a state-maintained road and that PennDOT has jurisdiction and control of the intersection where this accident occurred. Additionally, the complaint alleges that PennDOT was aware of the dangerous conditions of this intersection and that PennDOT was negligent in its supervision and maintenance of this intersection.[3]

---

2. The South Mountain Fair is an annual event held each fall in Adams County.

3. Plaintiffs' complaint alleges that PennDOT was negligent, reckless and careless in:

"(a) Failing to keep the intersection . . . in a reasonably safe condition for motor vehicles;

"(b) Failing to properly design, construct, inspect and maintain . . . the . . . intersection;

"(c) Failing to place adequate traffic control devices . . . at or near the intersection, . . . such as . . .

"(1) Failing to have or install street lights . . . ;

"(2) Failing to have or install rumble strips . . . ;

"(3) Failing to install traffic signal at the intersection . . . ;

"(4) Failing to install blinking yellow or red light . . . ;

During the course of discovery in preparation for trial, plaintiffs' counsel attempted to question PennDOT district engineer, Barry Hoffman, concerning a letter dated June 28, 1994, directed to Richard J. Bell Jr., a Penn-DOT employee. After the letter was identified, PennDOT's counsel objected and instructed Mr. Hoffman not to answer any further inquiry concerning the corre-

---

"(5) Failing to reduce the maximum, posted speed limit on Route 30 in the vicinity of the intersection; and

"(6) Failing to provide sufficient and safe advance notice . . . of the dangerous intersection. . . .

"(d) Failing to comply with state and federal regulations and statutes pertaining to highway construction and maintenance;

"(f) Notwithstanding prior notice of the dangerous design and condition of the intersection . . . failing to remedy the existing dangerous design and condition;

"(g) Placing a 40 mile-per-hour speed limit sign along Cashtown Road within a few hundred feet of the Route 30 intersection . . . ;

"(h) Placing several road signs in proximity to each other along the southern approach of Cashtown Road to Route 30 and immediately before the Route 30 intersection;

"(i) Placing a stop sign for southbound, Cashtown Road traffic on the left side of Cashtown Road and in a traffic island and behind another sign using similar or deceptively similar colors;

"(j) Placing a stop sign for the Route 30 intersection on the right side of the southbound lane of Cashtown Road such that it is hidden from motorists approaching Route 30 around the curve of Cashtown Road;

"(k) Finding, in a 1993 corridor study of Route 30 to identify dangerous intersections, that the Cashtown Road intersection was 'wide-open' with no sight obstructions;

"(l) Failing to provide warnings to motorists of the dangerous intersection because of defendant's belief that motorists might not obey the warnings;

"(m) Failing to perform an adequate and reasonable study of the intersection until more accidents occurred at that intersection;" By stipulation filed with the court, ¶ ¶ 29e and 29n of the complaint were stricken.

spondence. PennDOT raised similar objections in regard to three other pieces of correspondence. Generally, the four correspondences at issue consist of the following:

(i) A letter dated June 28, 1994, from Craig A. Hartley, vice-chairman of the Franklin Township Board of Supervisors to Richard J. Bell Jr., PennDOT (Hartley letter)—the letter references Franklin Township's concern in regard to the Route 30/Cashtown Road intersection. The correspondence references numerous accidents at the intersection that resulted in injuries and several fatalities. It indicates that the Cashtown Community Fire Department chief believes that the intersection is responsible for most of the accidents. The correspondence goes on to suggest a number of possible solutions, including rumble strips and blinking traffic control devices;

(ii) Correspondence dated July 28, 1994, from Barry G. Hoffman, PennDOT district engineer to Craig A. Hartley, vice-chairman of the Franklin Township Board of Supervisors (Hoffman letter 1)—the correspondence essentially acknowledges receipt of the June 27, 1994 letter and indicates that it was forwarded to the "district traffic unit" for review. The letter affirms that the district traffic unit will conduct a study at the intersection to determine the appropriate course of action.

(iii) Correspondence dated February 10, 1995, from Barry G. Hoffman, PennDOT district engineer, to Craig A. Hartley, vice-chairman of the Franklin Township Board of Supervisors (Hoffman letter 2)—this letter is a follow-up letter to the July 28, 1994 correspondence concerning the intersection that is the subject of litigation. The letter indicates that a safety study at the intersection has been completed and that the installation of

oversized stop signs "may prove to be an effective remedy to the accident problem . . . ." The letter advises the supervisors that a work order has been issued and that the signs will be installed as soon as materials are available and the work can be scheduled. The letter opines that the oversized signs "will be effective and should be thoroughly evaluated before proceeding with your request for a flashing warning device." It further indicates that installation of any flashing warning device would be at the expense of the Township. The letter rejects the use of rumble strips at the intersection due to "noise pollution" and the recognition that drivers sometimes drive "around the rumble strips by using the shoulder or the opposing traffic lane"; and

(iv) Correspondence dated October 12, 1995, from Barry Hoffman, PennDOT district engineer, to Pennsylvania State Senator Terry Punt (Punt letter). This letter is apparently in response to a letter from Senator Punt to PennDOT dated October 3, 1995.[4] The correspondence also generally references the accident that is the subject of this suit. In the correspondence, PennDOT acknowledges that safety improvements at the intersection are needed and that the following steps would be taken to address the accidents at that location: (1) PennDOT would fund the installation of a flashing intersection control beacon; (2) red flashers would remain in place as interim measures until the control beacon is operational; (3) 24-inch white plastic stop bars would be installed on both approaches to the Cashtown Road; and (4)

---

4. Senator Punt's letter to PennDOT is apparently not at issue and is not part of the current record.

PennDOT would be considering the installation of rumble strips on the southbound approach of Cashtown Road.

PennDOT urges that these correspondences are protected from discovery and that PennDOT officers and employees are protected from providing evidence pertaining to these correspondences since they are part of an in-depth accident investigation and are protected by the statutory provisions of 75 Pa.C.S. §3754 (West 1996). In support thereof, PennDOT has presented the affidavit of Devang D. Patel, assistant district traffic manager-safety for PennDOT engineering district 8-0,[5] which indicates that the Hartley letter is contained in the safety file for the intersection at State Route 30 and Cashtown Road. Moreover, the affidavit indicates that the Hartley letter served as a basis for generating an engineering and traffic study at the intersection; that the traffic study was concluded on February 10, 1995; that as a result of the subject accident, a second traffic study was commenced in September 1995, and ran through December 1, 1995; and that the "Punt letter" referenced improvements to the intersection as a result of the latter safety study.

Section 3754 of the Pennsylvania Vehicle Code provides as follows:

*"(a) General rule.*—The department, in association with the Pennsylvania State Police, may conduct in-depth accident investigations and safety studies of the human, vehicle and environmental aspects of traffic accidents for the purpose of determining the causes of traffic accidents and the improvements which may help prevent

---

5. The subject intersection is located within the district identified by PennDOT as engineering district 8-0.

similar types of accidents or increase the overall safety of roadways and bridges.

*"(b) Confidentiality of reports.*—In-depth accident investigations and safety studies and information, records and reports used in their preparation shall not be discoverable nor admissible as evidence in any legal action or other proceeding, nor shall officers or employees or the agencies charged with the development, procurement or custody of in-depth accident investigations and safety study records and reports be required to give depositions or evidence pertaining to anything contained in such in-depth accident investigations or safety study records or reports in any legal action or other proceeding." 75 Pa.C.S. §3754 (West 1996).

In analyzing the scope of the statutory privilege, I am mindful that evidentiary privileges are not favored. *Commonwealth v. Stewart,* 547 Pa. 277, 282, 690 A.2d 195, 197 (1997). "[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for the truth." *Id.,* quoting *Hutchison v. Luddy,* 414 Pa. Super. 138, 146, 606 A.2d 905, 908 (1992), quoting *Herbert v. Lando,* 441 U.S. 153, 175, 99 S.Ct. 1635, 1648, 60 L.Ed.2d 115 (1979). Pennsylvania appellate authority cautions trial courts to accept testimonial privileges "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *Stewart,* 547 Pa. at 282, 690 A.2d at 197, quoting *In re Grand Jury Investigation,* 918 F.2d 374, 383 (3d Cir. 1990), quoting *Trammel v. United States,* 445 U.S. 40,

46, 100 S.Ct. 906, 910, 63 L.Ed.2d 186 (1980). Consequently, I must narrowly construe the provisions of any privilege that operates to hamper a party's access to information potentially admissible in court. *Commonwealth v. Hall,* 744 A.2d 1287, 1289 (Pa. Super. 2000). In doing so, the circumstances under which the privilege is proposed to be applied must be scrutinized in order to ascertain whether the information sought to be protected falls within the scope of the enabling legislation. My inquiry, therefore, commences with an examination of the purpose of the statute. See 1 Pa.C.S. §§ 1921, 1922 (West 1995) (in interpreting legislative enactments, we are to ascertain and effectuate the intention of the legislature).

The legislative intent of 75 Pa.C.S. §3754 (West 1996) has evolved since the Act was originally adopted by the legislature on June 17, 1976.[6] At that time, the Pennsylvania Supreme Court had not yet abolished the doctrine of sovereign immunity. See *Mayle v. Pennsylvania Department of Highways,* 479 Pa. 384, 388 A.2d 709 (1978) (abolishing sovereign immunity). Accordingly, courts interpreting the original statute found that it was enacted "so that individuals would cooperate in the in-depth investigation [of accidents] without fear of being liable themselves." *Shoyer v. City of Philadelphia,* 96 Pa. Commw. 75, 80, 506 A.2d 522, 525 (1986). Apparently, in response to the decision in *Shoyer,* the legislature amended section 3754 to its current form on December

---

6. Unlike the current section, the original Act only prohibited the use of information, records and reports associated with in-depth accident investigations from being "admissible as evidence in any legal action or other proceeding . . . ." 75 Pa.C.S. §3754 (West 1996), historical and statutory notes.

11, 1986.[7] Subsequent to the amendment, courts interpreting this section have found an expanded purpose of the legislation in that it effects " 'a safe and efficient system of motor vehicle transportation in the Commonwealth' by providing its officers and employees 'an unbiased, honest and accurate body of information regarding motor vehicle accidents.' " *PennDOT v. Taylor,* 746 A.2d 626, 630 (Pa. Super. 2000), quoting *Mayfield v. PennDOT,* 23 D.&C.3d 79, 81-82 (Fayette C. 1982). The plain language of the section demonstrates the legislature's desire to improve traffic safety by enhancing PennDOT's access to information. *Taylor,* 746 A.2d at 630. Our appellate court's finding of the legislature's objective has been adopted by PennDOT and is not at issue. This stated objective is consistent with the objective of the statute as urged by PennDOT during argument.

However, our appellate courts have gone further in ascertaining the meaning and operation of this particular statute. The Superior Court has instructed that subsections (a) and (b) must be read together when interpreting this Act. Citing the Statutory Construction Act of 1932, 1 Pa.C.S. §1932 (West 1995), the Superior Court has determined that subparagraphs (a) and (b) of 75 Pa.C.S. §3754 (West 1996) relate to the same class of persons or things and, therefore, they are in pari materia and must

---

7. The amendments to this statute read, in relevant portion, "[i]n-depth accident investigations and safety studies and information, records and reports used in their preparation shall not be *discoverable* nor admissible as evidence in any legal action or other proceeding . . . ." 75 Pa.C.S. §3754(b) (West 1996). (emphasis added) This amendment overrides the Commonwealth Court's opinion in *Shoyer, supra,* which allowed discovery of this information.

be construed together as a single provision. *Hall,* 744 A.2d at 1290. Upon reading the two subsections in pari materia, the Superior Court concluded that in-depth accident investigations or safety studies are rendered undiscoverable only to the extent that they are compiled by PennDOT in association with the Pennsylvania State Police, and are done for the specific purpose of determining the causes of traffic accidents and the improvements which may help prevent similar types of accidents. *Id.* With this guidance, I will now address the specific issue before the court.

In regard to the Hartley correspondence, PennDOT argues that since this letter triggered the safety study at the intersection in question, and since it is included as part of the safety file, it is subject to the protections of section 3754. PennDOT reasons that since the statutory privilege protects information, records and reports used in the preparation of safety studies, the privilege must include all correspondence which directly relates to those studies. I am not persuaded by PennDOT's argument.

The letter in question, according to the affidavit of PennDOT, served as a basis for and generated the engineering study of the subject intersection. Notably, the affidavit does not indicate that this letter was something relied upon or used by PennDOT in the preparation of the study. There is a distinct difference between the triggering mechanism of a study and information accessed or developed during a study. I believe the statutory privilege is aimed at protecting the latter. See *Taylor, supra.* Since it is the burden of PennDOT to establish the applicability of a statutory privilege, the evidence before this court is insufficient to protect the Hartley letter.

As noted by the Superior Court in *Hall, supra:*

"A conclusion to the contrary, as urged by PennDOT, would expand a disfavored evidentiary privilege and more importantly, contravene clear limitations on the scope of section 3754 imposed by subsection (a). Every police report or investigation, regardless of its origin, would be subject to the full panoply of protections otherwise due only 'in-depth accident investigations and safety studies' conducted by 'the [D]epartment, in association with the Pennsylvania State Police.' All accident reports submitted to PennDOT would become privileged documents merely because they came into the possession of PennDOT, without legislative scrutiny or any consideration of the utility or harm inherent in proscribing disclosure. Such a result is in clear derogation of the plain language of section 3754(a). We cannot, by judicial fiat, expand this statutory privilege where the legislature has itself not chosen to do so." *Hall,* 744 A.2d at 1290.

Moreover, protecting documents that are not an integral part of a safety study but which find their way into a safety study file, would frustrate other statutory provisions and can potentially be abused as a shield to PennDOT liability in contravention of the express intent of the legislature. For instance, 42 Pa.C.S. §8522 (West 1998) requires that a Commonwealth agency have prior written notice of the dangerous condition of a highway that was created by potholes, sink holes or other similar conditions as a triggering device to the waiver of sovereign immunity. Under PennDOT's interpretation of the safety study privilege, conceivably such a written notice would be inadmissible at trial simply by PennDOT com-

mencing a safety study or placing the written notice in a safety study file. Such a result is absurd and an overly broad interpretation of section 3754. As previously mentioned, courts have interpreted the intent behind the privilege to allow for an unbiased, honest and accurate body of information in order to address highway safety. This section is not meant as a shield to liability, thereby insulating PennDOT for a failure to act in response to notice of a dangerous condition.

A close reading of the Hartley letter confirms that the letter is not reasonably related to the type of material intended to be protected by section 3754. I fail to discern how allowing inquiry into this particular correspondence will have a chilling effect on the legislative goal of the frank discussion of safety issues within PennDOT. On the other hand, barring the letter under an expansive reading of a statutory privilege will have the effect of decreasing PennDOT's accountability to the public, which potentially may have the negative effect of decreasing PennDOT's responsiveness to safety issues. Of course, such a result would fly in the face of the legislature's goal. Accordingly, the Hartley letter is not protected by the privilege.

Similarly, the record is absolutely void of any support for PennDOT's argument that the provisions of section 3754 protect the two Hoffman letters. As mentioned above, the party exerting a privilege has the burden of establishing the applicability of that privilege to the factual circumstances at issue. Despite the opportunity to present testimony at hearing, PennDOT relied upon the affidavit of Devang Patel. That affidavit is noticeably absent of any reference to the Hoffman letters. Accord-

ingly, I find that PennDOT has not satisfied its burden in regard to the two Hoffman letters and will allow inquiry into these pieces of correspondence.

Moreover, the language of the statutory privilege protects "accident investigations and safety studies and information, records and reports used in their *preparation* . . . ." 75 Pa.C.S. §3754(b) (West 1996). (emphasis added) The Hoffman correspondences, however, are neither actual investigations nor studies and clearly were not used "in the preparation" of such studies. The first Hoffman letter is nothing more than an acknowledgement of receipt of the Hartley letter. The second Hoffman correspondence indicates that the safety study was completed prior to preparation of the letter.[8] Narrowly construing the provisions of the section 3754 privilege, I find that it is inapplicable to this correspondence.

PennDOT argues that allowing inquiry into this correspondence discourages PennDOT's frank discussion of the results of its safety studies with municipal agencies. Although this argument is clearly misplaced as it relates to the first Hoffman letter, it deserves further inquiry as it relates to the second Hoffman letter. In particular, two references in that letter present intriguing issues. Specifically, the second Hoffman letter expresses the opinion that members of the district traffic unit "have concluded that the installation of oversized [s]top signs may prove to be an effective remedy to the accident problem . . ." at the intersection in question. Later, the letter opines that "[w]e do not feel rumble strips should be in-

---

8. Paragraph two of the February 10, 1995, letter reads: "Members of the district traffic unit have completed their safety study at this intersection . . . ."

stalled at this location at this time." In effect, PennDOT is providing the municipality with the results of their accident investigation and safety study. While I acknowledge the concern of PennDOT in this regard, I cannot expand the statutory language of the privilege beyond the express provisions of the statutory section at issue. If the legislature had intended to protect correspondence between PennDOT and municipal agencies, they would have expressly stated so in the legislation. I cannot, by judicial fiat, expand this privilege where the legislature has itself not chosen to do so. See *Hall,* 744 A.2d at 1290.

Moreover, I fail to grasp how disclosure of the Hoffman letters will frustrate the legislative goal of section 3754. Allowing inquiry into the results of a traffic analysis is quite different than permitting inquiry into information, sources of information or opinions obtained during the course of conducting a study. In fact, the results of the safety study are fairly evident to anyone travelling State Route 30. The correspondence sheds no great input on any dark secret but rather is written confirmation of actual remedial efforts taken at this location.[9]

In analyzing this issue, it is important to keep in mind that when a plaintiff is alleging that PennDOT had a governmental duty connected with the implementation of traffic controls, the burden of proof rests with the plaintiffs to establish that the pertinent device would have constituted an appropriate remedial measure. *Starr v.*

---

9. Although there may be other evidentiary objections to the admission of this proffered line of inquiry at trial, those issues are not before the court nor are they a proper basis to preclude discovery in this area. See Pa.R.C.P. 4003.1(b).

*Veneziano,* 560 Pa. 650, 747 A.2d 867 (2000).[10] The plaintiffs must prove, therefore, that an effective traffic control device exists that PennDOT did not implement even though it was reasonable to do so. Inquiry into the results reached by PennDOT, and shared with third parties, without permitting inquiry into the actual studies, neither prejudices PennDOT nor deters an unbiased, honest and accurate body of information being provided to PennDOT in effectuating a safe and efficient system of transportation. Therefore, inquiry limited solely to the correspondence(s) will be permitted.

The final correspondence at issue is the "Punt letter." Once again, for the reasoning set forth hereinabove, this letter is not subject to protection from discovery based upon the statutory privilege of section 3754. This letter postdates any traffic study and clearly is not part of the documentation used in *preparation of a traffic study.* As such, I cannot extend the limitations of the statutory privilege to encompass this correspondence.

Although, I recognize the chilling effect that this ruling may have on the frequency and substance of Penn-DOT communications to municipalities or other public agencies, if protection is needed in this area, it should be specifically provided for by the legislature. Significantly, the documents in question are not internal documents

---

10. In *Starr, supra,* the Pennsylvania Supreme Court held that in order to establish a duty of care on the part of a municipality related to the installation of traffic control device, "a plaintiff must demonstrate that: (1) the municipality had actual or constructive notice of the dangerous condition that caused the plaintiff's injuries; (2) the pertinent device would have constituted an appropriate remedial measure and (3) the municipality's authority was such that it can fairly be charged with the failure to install the device." *Id.* at 873.

but rather are correspondence forwarded to parties independent of PennDOT. In construing privileges in other areas, our appellate courts have consistently held that the protections of a privilege are waived when the privileged information is provided to a third party. See *Commonwealth v. Davis,* 543 Pa. 628, 632, 674 A.2d 214, 216 (1996) (statutory sexual assault counselor privilege waived where the victim provides the prosecution access to the records); *Joe v. Prison Health Services Inc.* 782 A.2d 24, 31 (Pa. Commw. 2001) (once attorney-client communications have been disclosed to a third party, the privilege is deemed waived); *Rost v. State Board of Psychology,* 659 A.2d 626, 629 (Pa. Commw. 1995) (Psychologist-client privilege may be waived where client has made information known to third persons). Like the privilege currently under scrutiny, each of the privileges addressed by our appellate courts are aimed at encouraging frank and open discussion among the respective parties. Even presuming that the correspondence at issue falls within the protections of section 3754, PennDOT's decision to provide this information to third parties has effectively waived any protection. I will not extend protections to the disclosure of this correspondence which have not been legislatively authorized.

For the foregoing reasons, the attached order is entered.[11]

---

11. In a supplemental memorandum, the plaintiffs have requested that the court direct PennDOT to provide access to its investigative file concerning the subject intersection. They argue that section 3754 protects only in-depth accident investigations conducted by the department "in association with the Pennsylvania State Police." This argument apparently finds its genesis in language contained in the Pennsylvania Superior Court's opinion in *Hall, supra.* Although the

## ORDER

And now, February 13, 2003, it is ordered that the Pennsylvania Department of Transportation shall produce District Engineer Barry Hoffman for purposes of completing inquiry by the plaintiffs into the correspondence referenced in the plaintiffs' motion to compel. It is further ordered that Mr. Bell, and any other PennDOT employee subject to deposition, shall answer questions limited to the correspondence. Said depositions shall be immediately scheduled at the convenience of the parties, however, shall take place within 45 days of this order unless the plaintiffs otherwise agree to an extension. At this time, the court renders no opinion as to whether the actual investigative files of the Pennsylvania Department of Transportation are discoverable.

---

argument is intriguing, it is premature. Specifically, the plaintiffs have neither made a formal discovery request of PennDOT's investigative files nor has PennDOT objected to discovery of this information. Although I suspect PennDOT will vehemently object to disclosure of its actual investigative reports, and counsel so much indicated the same during argument, I am uncomfortable with making a decision on an issue with statewide ramifications in light of the current status of the record in this matter. PennDOT has had neither the opportunity to establish a factual record nor properly brief and argue the issue. Although I recognize that judicial economy may be furthered by disposing of this issue since it is destined to arise, it is more important that a proper record be established. The parties are welcome to present a framed issue in this regard to the court so that an evidentiary hearing limited to the parameters of that issue may be scheduled.